USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____/___/____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAMON LUIS DAVILA, JR.,

                    Plaintiff,

    - against -

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

17cv6013 (JGK)

MEMORANDUM OPINION
AND ORDER

JOHN G. KOELTL, District Judge:

    This is an appeal from a denial by the Commissioner of
Social Security of claims for Title II Social Security
Disability Insurance Benefits ("DIB") and Title XVI Supplemental
Security Income ("SSI") under the Social Security Act.  The
plaintiff, Ramon Luis Davila, Jr., filed claims for DIB and SSI
alleging that he has bipolar disorder, schizoaffective disorder,
post-traumatic stress disorder, substance use disorder, asthma,
and scoliosis.  His claims were denied after an Administrative
Law Judge ("ALJ") found that the plaintiff is not disabled
within the meaning of the Social Security Act.

    The plaintiff now brings this appeal arguing that the ALJ
failed to give sufficient weight to the opinions of two treating
medical sources in violation of the "treating source rule."  The
plaintiff further argues that the ALJ erred in finding that the
plaintiff's impairment did not meet the listing at 20 C.F.R.
Part 404, Subpart P, Appendix 1, § 12.04; erred in failing to

1

consider the side effects of the plaintiff's medications on his residual functional capacity; and that the ALJ's finding that there are jobs in the economy that the plaintiff could perform is not supported by substantial evidence.

The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. As discussed below, the Commissioner's motion is **denied** and the plaintiff's motion is **granted.**

I.

The administrative record contains the following facts.

A.

The plaintiff was born in 1978 and was thirty-six years old at the time of the ALJ's decision. (R. 59, 274.) He completed high school, (R. 59), and worked as a bank teller, an insurance claims representative, and a customer service representative, (R. 49).

On December 15, 2014, the plaintiff filed an application for DIB and SSI, alleging disability beginning on January 5, 2012. (R. 274-86.) The plaintiff alleged disability due to bipolar disorder, post-traumatic stress disorder ("PTSD"), anxiety, lower back pain, and muscle spasms. (R. 303.) The plaintiff's claims were initially denied, (R. 118-22), and the plaintiff then requested a hearing before an ALJ, (R. 126-28).

The plaintiff, represented by counsel, attended an initial hearing before the ALJ on August 12, 2015. (R. 28-29.) The plaintiff, the plaintiff's mother, and a vocational expert named Andrew Vaughn testified. (R. 28-29.) A second hearing was held by video on December 8, 2015. (R. 56.) Dr. Sharon Kahn, a medical expert in psychiatry; Dr. Dorothy Kunstadt, a medical expert in internal medicine; and Victor Alberigi, a vocational expert, testified at the second hearing. (R. 56.) The plaintiff also submitted medical records in support of his application.

B.

The plaintiff's medical records show that the plaintiff was hospitalized for psychiatric treatment and diagnosed with bipolar disorder in 2011. (R. 489.) At that time, he was experiencing auditory hallucinations that were telling him to kill himself. (R. 489.)

In 2012, the plaintiff lost his job due to excessive absences. (R. 489.)

On October 17, 2014, the plaintiff was psychologically evaluated by the Federation Employment and Guidance Services in connection with an application he filed for public assistance (R. 452-57.) At that examination, the plaintiff reported that he had been diagnosed with bipolar disorder, (R. 454), that he was hospitalized in October 2011, (R. 454), and that his last mental health appointment was on January 12, 2012, (R. 454).

The examiner found that the plaintiff was "depressed[,] irritable[,] and will have a problem relating at work." (R. 465.)

In October 2014, the plaintiff began seeing a psychiatrist, Dr. Laurence Dopkin, and a psychologist, Dr. Karthik Gunnia (together, the "treating doctors"). (R. 472-76.) From October 2014 to at least May 26, 2015, the plaintiff met with Dr. Dopkin two to four times per month and with Dr. Gunnia once per month. (R. 472.)

On February 5, 2015, Dr. Dopkin submitted a Treating Physician's Wellness Plan Report, in which he indicated that the plaintiff had bipolar disorder and suffered from depression, poor appetite, low energy, low self-esteem, poor concentration, difficulty making decisions, sleeping problems, and continued depressive episodes despite treatment. (R. 466.) Dr. Dopkin opined that the plaintiff would be unable to work for at least twelve months. (R. 467.)

On February 12, 2015, Dr. Gunnia reported that the plaintiff was being treated for schizoaffective disorder with the medications Seroquel and Remeron. (R. 469.)

On May 26, 2015, the treating doctors provided a joint Medical Source Statement. (R. 472-76.) In this joint

statement, the doctors stated that the plaintiff's GAF[1] score was 45. (R. 472.) They noted that the plaintiff had poor memory, sleep and mood disturbance, emotional lability, delusions or hallucinations, feelings of guilt, difficulty thinking or concentrating, suicidal ideations or attempts, oddities of thought, perceptual disturbances, social withdrawal or isolation, and manic syndrome. (R. 472.)

The treating doctors reported in the joint Medical Source Statement that the plaintiff had frequent auditory hallucinations, racing thoughts, intermittent suicidal ideations, and difficulties with concentration and memory. (R. 473.) The plaintiff was taking Seroquel and Remeron, which caused lethargy. (R. 473.) The two treating doctors further opined that the plaintiff would have to be absent from work more than three times a month, that he had extreme loss of his ability to maintain attention and concentration, and extreme loss of ability to complete a normal workday without

[1]    "The GAF score, for 'global assessment of functioning,' is a numeric scale ranging from 0 (lowest functioning) through 100 (highest functioning). The GAF is a scale promulgated by the American Psychiatric Association to assist in tracking the clinical progress of individuals [with psychological problems] in global terms." Mainella v. Colvin, No. 13cv2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014) (quotation marks omitted); Taylor v. Berryhill, No. 15cv403, 2017 WL 4570388, at *2 (W.D.N.Y. May 17, 2017) (noting that a GAF score between 41 and 50 reflects "serious symptoms (e.g. Suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)" (quotations and alterations omitted)), report and recommendation adopted, No. 15cv403, 2017 WL 4541014 (W.D.N.Y. Oct. 11, 2017).

interruptions from psychologically based symptoms. (R. 473-74.)
The plaintiff also showed a marked loss of his ability to
understand, remember, and carry out detailed instructions,
maintain regular attendance and be punctual, sustain an ordinary
routine without special supervision, deal with the stress of
semi-skilled work, work in coordination with or proximity to
others without being unduly distracted, accept instructions and
respond appropriately to criticism from supervisors, or perform
at a consistent pace without an unreasonable number and length
of rest periods. (R. 474.)

The treating doctors also reported moderate limitations in
his ability to understand, remember, and carry out very short
simple instructions, make simple work related decisions,
interact appropriately with the public, get along with
coworkers, respond appropriately to changes in a routine work
setting, travel in unfamiliar places, and use public
transportation. (R. 474.) The treating doctors further opined
that the plaintiff had moderate difficulties in maintaining
social functioning, frequent deficiencies of concentration,
persistence or pace, and repeated episodes of decompensation.
(R. 475-76.)

In connection with his application for benefits, the plaintiff attended three consultative examinations, in January,[2] July,[3] and September[4] 2015. At the January and July

[2]    On January 22, 2015, the plaintiff underwent a psychological consultative examination by Dr. Howard Tedoff. (R. 442.) Dr. Tedoff reported that the plaintiff had no friends, locked himself in his room, heard voices daily, and suffered from PTSD caused by childhood sexual abuse. (R. 442-45.) Dr. Tedoff noted that the plaintiff was dressed adequately but needed to shave, his eye contact was intermittent, his affect was subdued, his mood was dysthymic and his judgment was suspect. (R. 444.) Dr. Tedoff opined that the plaintiff had moderate to marked limits in his ability to maintain a regular schedule, relate adequately with others, and to deal with stress. He further opined that the plaintiff's decision-making skills were adversely affected by his psychiatric disorder. (R. 442-45.) Dr. Tedoff noted that the evaluation appeared "to be consistent with psychiatric problems and these have interfered with the claimant's ability to function socially in the workplace on a daily basis," and that "[t]he prognosis for the claimant being able to look for, obtain and sustain himself in gainful employment in the near future is guarded." (R. 445.)

[3]    On July 6, 2015, the plaintiff underwent a psychological consultative examination by Dr. Arlene Broska, a psychologist. (R. 489.) Dr. Broska found that "[t]here [wa]s evidence for moderate limitation in maintaining a regular schedule, performing complex tasks consistently, making appropriate decisions, relating adequately with others, and appropriately dealing with stress." (R. 492.) Dr. Broska diagnosed the plaintiff with unspecified bipolar and related psychotic features, unspecified anxiety disorder, and Cannabis use disorder, but ruled out schizoaffective disorder. (R. 493.) Dr. Broska recommended psychiatric intervention and individual psychological therapy and indicated that the plaintiff's prognosis was guarded without consistent treatment. (R. 493.)

[4]    On September 11, 2015, the plaintiff underwent a psychological consultative examination by Dr. W. Amory Carr. (R. 524.) Dr. Carr noted that the plaintiff was unkempt, his grooming was poor, he was slouched, and his motor behavior was lethargic. (R. 525.) His affect and mood were dysphoric. (R. 525.) Dr. Carr opined that the plaintiff had marked limitation in his ability make judgements on simple work-related decisions, interact appropriately with the public or respond appropriately to usual work situations and changes in a routine work setting; moderate to marked limitations in his ability perform simple tasks and to deal with stress; and moderate limitations in his ability to follow and understand simple directions, carry out simple instructions, interact appropriately with supervisors and coworkers, maintain a regular schedule, learn new tasks, make appropriate decisions, and relate adequately with others. (R. 526-28.) Dr. Carr diagnosed the plaintiff with "schizoaffective disorder, depressed type. Unspecified anxiety disorder." (R. 527.) Dr. Carr indicated that the results of the examination were consistent with psychiatric problems that "may significantly interfere with the [plaintiff's] ability to function on a

examinations, the examiners concluded that the plaintiff showed marked limitations in maintaining a schedule, performing complex tasks consistently, making appropriate decisions, relating adequately with others, and appropriately dealing with stress. (R. 442-45, 489-92.) In the September evaluation, the examiner found that the plaintiff was moderately limited in his ability to follow and understand directions and instructions, learn new tasks, make appropriate decisions, maintain a regular schedule, and relate adequately with others. (R. 524-25.)

Overall, the three consultative examiners reported (1) that the plaintiff's evaluation appeared "to be consistent with psychiatric problems and these have interfered with the claimant's ability to function socially in the workplace on a daily basis," (Dr. Howard Tedoff, R. 445); (2) that the plaintiff's prognosis was guarded without consistent psychological treatment, (Dr. Arlene Broska, R. 493); and (3) that the plaintiff's psychiatric problems "may significantly interfere with [his] ability to function on a daily basis," (Dr. W. Amory Carr, R. 526-27).

## C.

At the hearings before the ALJ, the plaintiff testified that, at that time he filed his claim, he lived with his mother

daily basis." (R. 526-27.) Dr. Carr recommended continued psychological and psychiatric treatment. (R. 527.)

who cooked and cleaned for him and had to remind him to maintain his personal hygiene. (R. 36.) He testified that he had "bad thoughts" at times, trouble sleeping, nervousness and anxiety around others, that it was hard for him to get out of the house, (R. 38), that there were days he could not get out of bed, (R. 78), that he experienced both auditory and visual hallucinations, (R. 51), and that he would sometimes rock back and forth holding his head to shut out the voices in his head, (R. 62).

The plaintiff's mother also testified and generally confirmed the plaintiff's description of his symptoms. She testified that the plaintiff was often tired and depressed, (R. 47-48), that on a bad day, he had "a lot of anxiety, irritation, and confusion," (R. 44), and that three to four times a week he would rock back and forth and pace around the house threatening to end his life, (R. 44-45). She also testified that he would sometimes talk to himself. (R. 44-46.)

Dr. Kahn, a psychologist, testified as a medical expert. (R. 69.) Dr. Kahn did not examine the plaintiff and indeed Dr. Kahn never met the plaintiff. Dr. Kahn opined that the plaintiff's mental impairment did not meet a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 70.) Dr. Kahn testified that she disagreed with the treating doctors' conclusions in their joint Medical Source Statement because, in

9

Dr. Kahn's view, there was no reasoning to support their determination of marked impairments. (R. 81.) Dr. Kahn asserted that she agreed with the treating doctors' data, but "disagree[d] with their interpretation of the data." (R. 86.) She claimed that the plaintiff's impairments would cause the claimant moderate limitations in activities of daily living and in social functioning, but no problems with memory, concentration, and pace. (R. 18.) She further opined that the claimant could do simple routine repetitive work. (R. 18.)

On January 20, 2016, the ALJ issued a decision finding that the plaintiff was not disabled. (R. 9-27.) The ALJ's decision became the final decision of the Commissioner on June 9, 2017, when the Appeals Council denied the plaintiff's request for review. (R. 1-4.) This appeal followed.

## II.

A court may set aside a determination by the Commissioner only if it is based on legal error or is not supported by substantial evidence in the record. See 42 U.S.C. §§ 405(g), 1383(c)(3); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). Substantial evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quotation marks omitted).

A claimant qualifies as disabled if the claimant suffers from any "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months" that prevents the claimant from engaging in any "substantial gainful activity." 42 U.S.C. § 1382c(a)(3)(A).[5]

The Commissioner's regulations provide a five-step inquiry to determine if a claimant is disabled. At Step One, the Commissioner considers whether the claimant is engaged currently in substantial gainful activity. If not, the Commissioner proceeds to Step Two and considers whether the claimant has a severe impairment that limits the claimant's mental or physical ability to do basic work activities. If the claimant has a severe impairment, the Commissioner proceeds to Step Three, which requires determining, based solely on medical evidence, whether the claimant has an impairment listed in Appendix 1 of the regulations. If so, the Commissioner shall consider the claimant disabled without considering the vocational factors of age, education, and work experience. If the impairment is not listed in the regulations but is determined to be a severe

---

[5]    The definition of "disability" for purposes of eligibility for DIB and SSI benefits is virtually identical, as is the standard for judicial review. Therefore, cases discussing relevant issues for determining SSI benefits are instructive for determining DIB benefits and vice versa. See Burton-Mann v. Colvin, No. 15cv7392, 2016 WL 4367973, at *3 n.5 (S.D.N.Y. Aug. 13, 2016) (citing Hankerson v. Harris, 636 F.2d 893, 895 n.2 (2d Cir. 1980)).

impairment, Step Four requires the Commissioner to determine the claimant's residual functional capacity ("RFC") and, based on that determination, ask whether, despite the claimant's severe impairment, the claimant can perform the claimant's past work. Finally, if the claimant is unable to perform such past work, at Step Five the Commissioner determines whether there is other work that the claimant could perform. 20 C.F.R. §§ 404.1520(a), 416.920(a); see Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also Moreira v. Colvin, No. 13cv4850, 2014 WL 4634296, at *4 (S.D.N.Y. Sept. 15, 2014). The claimant bears the burden of proof through the first four steps; the burden shifts to the Commissioner at the fifth step. Shaw, 221 F.3d at 132.

Where the claimed impartment is a mental impairment, Social Security Regulations require the ALJ to use a "special technique" to evaluate the claim. See 20 C.F.R. § 416.920a(a). At Step Two of the five-step procedure for evaluating disability, the ALJ must rate the degree of functional limitation resulting from the plaintiff's mental impairment to determine whether it is "severe." See id. § 416.920a(d)(1). If the plaintiff's mental impairment is severe, then the ALJ must determine whether the impairment meets or is equivalent in severity to a listed mental disorder in 20 C.F.R. Part 404, Subpart P, Appendix 1. See id. § 416.920a(d)(2). If the

plaintiff meets a listing, then the plaintiff is considered disabled. If the plaintiff is found to have a "severe impairment" that is not listed in the Appendix, then the ALJ must assess the plaintiff's RFC to determine whether the plaintiff can meet the mental demands of past relevant work in spite of the limiting effects of the plaintiff's impairment and, if not, whether the plaintiff can do other work, considering the plaintiff's remaining mental capacities reflected in terms of the plaintiff's occupational base, age, education, and work experience. See id. § 416.920a(d)(3); see also Avila v. Astrue, 933 F. Supp. 2d 640, 651 (S.D.N.Y. 2013).

When employing this five-step process, the Commissioner must consider four factors in determining a claimant's entitlement to benefits: "(1) the objective medical facts; (2) diagnoses of medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam) (quotation marks and citation omitted).

The "treating source rule" requires an ALJ who is deciding whether the claimant is disabled to consider the opinion of the

claimant's treating doctors.[6]  20 C.F.R. § 416.927(c)(2); see

Shaw, 221 F.3d at 134.  Traditionally, but not always, an ALJ

must accord great weight to such opinions.  See Shaw, 221 F.3d

at 134.  An ALJ must accord controlling weight to a treating

source's opinion when it is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and not

inconsistent with substantial evidence of record.  20 C.F.R.

§ 404.1527(c)(2).

Where, as in this case, "mental health treatment is at

issue, the treating physician rule takes on added importance."

Tilles v. Comm'r of Soc. Sec., No. 13cv6743, 2015 WL 1454919, at

*28 (S.D.N.Y. Mar. 31, 2015).  Mental health patients have good

days and bad days; they "may respond to different stressors that

are not always active.  Thus, the longitudinal relationship

between a mental health patient and her treating doctor provides

the physician with a rich and nuanced understanding of the

patient's health that cannot be readily achieved by a single

---

[6]     The Social Security Administration adopted regulations in March 2017
that effectively abolished the treating physician rule; however, it did so
only for claims filed on or after March 27, 2017.  See 20 C.F.R.
§ 416.920c(a) ("We will not defer or give any specific evidentiary weight,
including controlling weight, to any medical opinion(s) . . . , including
those from your medical sources . . . .  [W]e will consider those medical
opinions . . . together using the factors listed in paragraphs (c)(1) through
(c)(5) of this section, as appropriate.").  The plaintiff filed his claim
before March 27, 2017.  Thus, the treating physician rule under the
previously existing regulations applies.  See Tanya L. v. Comm'r of Soc.
Sec., No. 17cv136, 2018 WL 2684106, at *4 n.1 (D. Vt. June 5, 2018) ("Because
Plaintiff filed her claims before March 2017, however, the Court applies the
treating physician rule under the earlier regulations (20 C.F.R. § 416.927),
and not under the more recent ones (20 C.F.R. § 416.920c).").

consultative examination." Id.; see Rodriguez v. Astrue, 07cv534, 2009 WL 637154, at *26 (S.D.N.Y. March 9, 2009) ("The mandate of the treating-physician rule to give greater weight to the opinions of doctors who have a relationship with a plaintiff is particularly important in the mental-health context.").

If an ALJ gives opinions of a treating doctor less than controlling weight, the ALJ must specify "good reasons," Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(d)(2)), and must justify the alternate weight by referring to four factors listed in the Social Security regulations: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." Brickhouse v. Astrue, 331 F. App'x 875, 877 (2d Cir. 2009) (summary order) (quotation marks omitted). Failure to provide "good reasons" for discrediting the opinion of a plaintiff's treating doctor or failure to justify giving less than controlling weight with reference to the Social Security regulations is a ground for remand. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

### III.

In this case, the ALJ determined that the plaintiff satisfied Steps One and Two and determined, at Step Four, that

the plaintiff could not perform his past work. However, the ALJ found that the plaintiff did not meet a listing at Step Three and, at Step Five, the ALJ held that there were jobs in the economy that the plaintiff could perform.[7] Thus, the ALJ denied the plaintiff's application for SSI and DIB.

### A.

The ALJ found that the plaintiff's mental impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14-15.) The plaintiff argues that the ALJ should have found that he qualified under listing § 12.04: "Affective Disorders."[8]

Under § 12.04, a claimant qualifies for the listed impairment if the claimant satisfy either paragraphs A and B or paragraphs A and C. Paragraph A can be satisfied by showing that the claimant has depressive syndrome, manic syndrome, or bipolar syndrome. The plaintiff argues that the ALJ erred in finding the plaintiff did not meet the requirements of paragraph A-1 -- "depressive syndrome" -- and paragraph B of the § 12.04 listing. The ALJ did not address paragraph A but found that the

---

[7] The ALJ held that the plaintiff could work as a packing line worker, a mail clerk, or an assembler of small products. (R. 21-22.)

[8] 20 C.F.R. Part 404, Subpart P, Appendix 1 has been updated since the plaintiff's disability hearing. The iteration referenced herein is the version that was in effect at the time of the plaintiff's hearing.

plaintiff did not meet the § 12.04 listing because the plaintiff did not satisfy paragraph B.

**1.**

To satisfy paragraph A-1 of the § 12.04 listing, a claimant must show a "[m]edically documented persistence, either continuous or intermittent, of . . . [d]epressive syndrome characterized by at least four of the following":

    a. Anhedonia or pervasive loss of interest in almost all activities; or

    b. Appetite disturbance with change in weight; or

    c. Sleep disturbance; or

    d. Psychomotor agitation or retardation; or

    e. Decreased energy; or

    f. Feelings of guilt or worthlessness; or

    g. Difficulty concentrating or thinking; or

    h. Thoughts of suicide; or

    i. Hallucinations, delusions, or paranoid thinking.

20 C.F.R. Part 404, Subpart P, Appendix 1, ¶ A-1.

The plaintiff's medical records satisfy the requirements of paragraph A. In the treating doctors' joint Medical Source Statement,[9] Drs. Dopkin and Guinna state that the plaintiff suffers from five of the required symptoms for depressive

---

[9]    The ALJ refers to the joint Medical Source Statement as having issued only from the plaintiff's treating psychiatrist, Dr. Dopkin. (R. 18-19.) However, the joint Medical Source Statement was also signed by Dr. Gunnia, the plaintiff's treating psychologist. (R. 476.)

disorder: sleep disturbance, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, and hallucinations, delusions, or paranoid thinking. (R. 472.)

## 2.

To satisfy the paragraph B criteria of the § 12.04 listing, the mental impairments must result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.[10]

---

[10]     The regulations define decompensation:

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

> The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional

In the treating doctors' joint Medical Source Statement, the doctors found that the plaintiff satisfied two of these categories. The doctors stated that the plaintiff has "frequent" deficiencies of concentration, persistence, or pace[11] and "repeated" episodes of deterioration or decompensation "in work or work-like settings which cause the [plaintiff] to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors)." (R. 475-76.) The ALJ disagreed with the treating doctors. The ALJ found that the plaintiff had only "mild difficulties" with regard to concentration, persistence, or pace and that the plaintiff had experienced only one episode of decompensation of extended duration that was documented by the plaintiff's hospitalization. (R. 15-16.)

Under the treating source rule, the ALJ was required to give great weight to the treating doctors unless there were good reasons not to do so. Tilles v. Comm'r of Soc. Sec., No. 13cv6743, 2015 WL 1454919, at *28 (S.D.N.Y. Mar. 31, 2015). The

---

effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. Part 404, Subpart P, Appendix 1.

[11]    The ALJ considered the "frequent" deficiencies to be equivalent to a "marked" difficulty. (See R. 19.)

ALJ gave three reasons for discounting the treating doctors' opinions. None of the reasons are persuasive.

First, the ALJ stated that he gave "little weight" to the treating doctors' opinions that the plaintiff had marked limitations in concentration, persistence, and pace because the treating doctors did not provide any objective test results or data. This was not a proper reason to discount the treating doctors' opinion. If the ALJ believed the doctors' records were insufficient, the ALJ should have developed the record to determine why objective test results had not been provided. Tavarez v. Barnhart, 124 F. App'x 48, 50 (2d Cir. 2005) (holding the ALJ was obligated to develop record to determine whether there was objective support for treating physician's opinion psychological impairment before discounting opinion for absence of objective evidence). Indeed, it is possible that evaluation of a patient's psychological health will not produce objective data. The testimony by the plaintiff and his mother provided some support for a finding of periods of decompensation. The plaintiff testified that there were periods where he could not leave his house, or even his bed, and he wandered around the house rocking back and forth with hallucinations and suicidal ideations. The ALJ was required to develop the record before summarily discounting the treating doctors' opinion based on an alleged lack of objective data. See id.

Second, the ALJ gave little weight to the treating doctors'
opinions on concentration, persistence, and pace because --
according to the ALJ -- their opinions were contradicted by the
consultative examination reports.  That is simply not true.  The
consultative examiners did not specifically give an opinion on
whether the plaintiff had a marked impairment regarding
concentration, persistence, and pace.   And, overall, the
consultative examiners concluded that the plaintiff's impairment
would hinder his ability to work.  (See, e.g., R. 526-27 (Dr.
Carr stating that the plaintiff's psychiatric problems "may
significantly interfere with [his] ability to function on a
daily basis").)[12]  Moreover, even if the consultative examiners'
opinions contradicted the treating doctors' opinions, the
treating source rule required the ALJ to give greater weight to

---

[12]     The examiner from the January consultative examination concluded that
"[t]he results of the evaluation appear to be consistent with psychiatric
problems and these have interfered with the claimant's ability to function
socially and in the workplace on a daily basis."  (R. 445.)  The ALJ noted
that the consultative examinations resulted in conclusions that the plaintiff
would have difficulty holding a job; however, the ALJ gave these conclusions
only "partial weight," despite the consulting examination opinions being in
line with the treating doctors' opinions.  The ALJ also stated that
conclusion from the January and July consultative exams finding that the
plaintiff had "moderate to marked limitations in maintaining a regular
schedule" was not supported because "the claimant's treating psychiatrist
reported that the claimant attends scheduled psychiatric appointments and
weekly therapy sessions, and takes prescribed medication, which suggests an
ability to maintain a regular schedule."  (R. 19.)  This conclusion directly
contradicts the opinions of almost every psychiatric or psychological doctor
who examined the plaintiff.  Furthermore, the plaintiff's ability to attend
therapy once a week and to take medication is not a fair basis to contradict
the opinion of multiple doctors that the plaintiff cannot adequately adhere
to a work schedule.

the treating doctors' opinions. Olejniczak v. Colvin, 180 F.
Supp. 3d 224, 228 (W.D.N.Y. 2016) ("The treating physician rule
recognizes that a physician who has a long history with a
patient is better positioned to evaluate the patient's
disability than a doctor who observes the patient once for the
purposes of a disability hearing." (quotation marks and citation
omitted)).

Third, the ALJ stated that the treating doctors' opinion on
decompensation was not supported by the record because the
plaintiff had been hospitalized only once for psychological
reasons. (R. 19.) However, the plaintiff might not have been
hospitalized for each decompensation episode. Under the
regulations, hospitalization is only one means of showing an
episode of decompensation. See supra note 10. To the extent
that the ALJ found that the records supporting the treating
doctors' opinions were not sufficient to support their
conclusions, it was the ALJ's responsibility to seek any medical
records to complete the file. See Pratts v. Chater, 94 F.3d 34,
37 (2d Cir. 1996); Echevarria v. Sec'y of Health & Human Servs.,
685 F.2d 751, 755 (2d Cir. 1982).[13]

---

[13]    At oral argument, the defendant argued that, pursuant to 20 C.F.R.
§ 404.1520b, the ALJ was entitled to supplement deficiencies in the record in
any way the ALJ saw fit -- that is, the ALJ did not need to ask the treating
doctors for more information before finding that the doctors' opinions were
unsupported. Under § 404.1520b(c), if the ALJ has insufficient evidence to
determine whether the claimant is disabled, the ALJ may "recontact [the]

Therefore, the ALJ erred by rejecting the treating doctors' opinion and should have found either that the plaintiff qualified for the § 12.04 listing or that more information was needed to resolve the alleged insufficiency of evidence.

**B.**

**1.**

The plaintiff also argues that the ALJ erred by finding that his RFC qualified him for jobs in the economy. At Step Four of the sequential evaluation process, the ALJ found that the plaintiff had the RFC to

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is able to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk with normal breaks for a total of about 6 hours in an 8-hour workday; sit with normal breaks for a total of about 6 hours in an 8-hour workday; can occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds; can occasionally balance, kneel, crouch, and squat, but never crawl; and the work does not require manipulation using the bilateral lower extremities such as foot controls or foot pedals; does not involve hazards such as dangerous machineries, motor vehicles, unprotected heights or vibrations; avoids even moderate exposure to odors, dusts, fumes, gasses, poor ventilation, toxic dusts, chemicals or other respiratory irritants; and the claimant can perform simple, routine and repetitive tasks, specifically [Specific Vocational Preparation ("SVP") ratings] 1 and 2, which involve making simple decisions, and only occasional changes in routine; and no contact with the public, and only brief,

---

treating physician," "request additional existing records," "ask [the claimant] to undergo a consultative examination," or "ask [the claimant] or others for more information". While the ALJ was not required to recontact the treating doctors, the ALJ was required to resolve the alleged insufficiency of the evidence to support the opinion of the treating physicians.

occasional, and superficial contact with coworkers and supervisors, and allows the ability to be off task 5 percent of the time.

(R. 16.) Based on this RFC, the ALJ found, at Step Five, that the plaintiff could work as a packing line worker, mail clerk, or as an assembler of small products. The plaintiff argues that the ALJ incorrectly found that the plaintiff would be able to maintain regular attendance and be punctual or sustain an ordinary routine.

In the joint Medical Source Statement, the plaintiff's treating doctors opined that the plaintiff had extreme loss of his ability to maintain attention and concentration and extreme loss in his ability to complete a normal workday without interruptions from psychologically based symptoms. (R. 474.) The treating doctors further opined that the plaintiff had marked loss in his ability to maintain regular attendance and be punctual, to sustain an ordinary routine, or to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 474.) They opined that the plaintiff would be absent from work more than three times a month. (R. 473.) At the plaintiff's hearing, the ALJ stated he took "judicial notice that if a person is late with unskilled work that they are going to be terminated." (R. 52-53.)

However, the ALJ gave "little weight" to the treating doctors' opinions. The ALJ stated that the treating doctors'

findings were contradicted by "the findings of all three consultative examiner[s'] mental status exams in January, July, and September 2015." (R. 19.) The ALJ also stated that the treating doctors' opinions that "[the plaintiff] would have multiple episodes of decompensation" was "not supported by the record." (R. 19.)

Contrary to the ALJ's assertion, the consultative examiners found that the plaintiff would struggle to maintain a regular work schedule and stay on task while at work. Dr. Tedoff opined that the plaintiff had moderate to marked limits in his ability to maintain a regular schedule. (R. 445.) Dr. Broska opined that there was evidence of moderate limitation in the plaintiff's ability to maintain a regular schedule. (R. 492.) And Dr. Carr opined that the plaintiff had moderate limitation in his ability to maintain a regular schedule and that the plaintiff's "psychiatric problems . . . may significantly interfere with [his] ability to function on a daily basis." (R. 527.)

The ALJ noted the consultative examiners' findings and assigned "partial weight" to two of the opinions and "little weight" to the third opinion. The ALJ gave partial weight to Drs. Tedoff's and Broska's opinions, reasoning that "the finding of moderate to marked limitations in maintaining a regular schedule is not supported and the [plaintiff's] treating

psychiatrist reported that the [plaintiff] attends scheduled psychiatric appointments and weekly therapy sessions, and takes prescribed medication, which suggests an ability to maintain a regular schedule." (R. 19.) The ALJ gave Dr. Carr's opinion "little weight," because, the ALJ said, the opinion "[wa]s not supported by [Dr. Carr's] essentially normal findings in the mental status exam, and the opinion appears internally inconsistent, as the doctor opines that the [plaintiff] would be moderately to markedly limited in both his ability to perform simple tasks and his ability to perform complex tasks." (R. 19-20.)

The ALJ gave "great weight" to the opinion of Dr. Kahn, the psychological medical examiner. Dr. Kahn never examined the plaintiff but testified that the plaintiff had no problems with memory, concentration, or pace, and that the plaintiff could do simple routine repetitive work. The ALJ stated that Dr. Kahn's opinion was supported by all three consultative examiners' opinions and entitled to "great weight."

**2.**

The ALJ's decision in this case to assign the greatest weight to the opinion of the medical expert, who never met or examined the plaintiff, and to discount or reject the opinions of the two treating doctors and the three consultative examiners, constitutes reversible error. See Maldonado v.

Comm'r of Soc. Sec., No. 12cv5297, 2014 WL 537564, *15 (E.D.N.Y. Feb. 10, 2014) ("In the context of evaluating a mental disability, it is improper to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient. Accordingly, the conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little, if any, weight." (quotation marks omitted)); see also Canales v. Comm'r of Soc. Sec., 698 F.Supp.2d 335, 342 (E.D.N.Y.2010) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health." (citing Richardson v. Astrue, 09cv1841, 2009 WL 4793994, at *7 (S.D.N.Y. December 14, 2009))). Moreover, at the plaintiff's hearing, Dr. Kahn appeared to be unfamiliar with the consultative examinations in the record, and repeatedly testified that she did not recall some of the examiners' opinions.

Moreover, the ALJ's statement that the consultative examiners' opinions supported Dr. Kahn's opinion and did not support the treating doctors' opinions was simply incorrect. The treating doctors and the consultative examiners each noted that the plaintiff would struggle to maintain attendance and stay on task. And, in any event, the treating doctors had a

longitudinal relationship with the plaintiff that eclipsed that of the consultative examiners and Dr. Kahn; the treating doctors were in the best position to evaluate and opine on the plaintiff's condition. See, e.g., Bogdan v. Colvin, 2016 WL 1398986, *4 (W.D.N.Y. Apr. 11, 2016) (reversing and remanding an ALJ's decision where the treating psychiatrist's opinion established the plaintiff's disability as a matter of law).

The ALJ rationalized that the plaintiff would not struggle to maintain attendance and focus in a job because he was able to attend therapy and take his medication. This was a poor reason to discount the treating doctors' and consultative examiners' opinions. There is plainly a difference between showing up at work each day and attending periodic therapy sessions. At bottom, the ALJ substituted his opinion for that of the treating doctors and the consultative examiners. He found that because the plaintiff was able to attend weekly therapy sessions and take medication, the plaintiff had the "ability to maintain a regular schedule." (R. 19.) It was improper for the ALJ to substitute his opinion on a medical issue for that of a medical professional. See, e.g., Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000) ("[The ALJ is not] permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion.").

*     *     *

For the foregoing reasons, the Commissioner's cross-motion for judgment on the pleadings, (Dkt. No. 13), is **denied** and plaintiff's motion, (Dkt. No. 15), is **granted**. This matter is remanded for further consideration consistent with this Opinion.

**CONCLUSION**

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. The Clerk of Court is directed to enter judgment remanding this case to the Commissioner of Social Security for further proceedings consistent with this Opinion. The Clerk is also directed to close all pending motions and to close this case.

**SO ORDERED.**

Dated:    **New York, New York**
             **March 18, 2018**

**John G. Koeltl**
**United States District Judge**